Good morning. The United States Court of Appeals for the Ninth Circuit is now in session. Good morning. Welcome to the Ninth Circuit. We have one case already submitted and that is Garcia Salinas v. Garland. Our first case for argument today is United States v. Duren. And Mr. Kirby, you can begin when you're ready and let us know if you want to reserve some time for rebuttal. Yes, Your Honor. John Kirby on behalf of Mr. Tyrone Duren, I would ask to reserve two minutes for rebuttal. Your Honors, there are really three significant areas I'd like to address. The first is the aggravated role that the district court imposed in this case. That was incorrect and the reason it was incorrect is that there was not another criminally responsible participant in the crime that was charged. The government and sentencing sort of was all over the board on who the other participant may have been. At one point they said that the victim who was robbed in July of 2013 was a participant and finally settled on Ms. Duren. His wife, who was a co-defendant in the case, played guilty. She did make deposits and was a signatory on the foreign bank account and then was involved in, I guess she played guilty to the false statements in the bank fraud scheme. And why couldn't the district court rely on those Well, as an initial matter, from the time period of July 2013, which was the first theft that the court recognized, during the period following that she made exactly one deposit. And all the other deposits she made were before July 2013, before the money, before the thefts had even occurred. But don't we have to, Mr. Kirby, don't we have to find that the district court clearly erred in its factual determination? And even if she only made one deposit after a drug courier was ripped off, plus the conduct involving the establishment of the foreign bank account, to which she later became a signatory, why isn't that sufficient, as a matter of fact, support the district court's determination? Because there was no evidence at all that she had knowledge of the money laundering scheme. In fact, I believe it was SR2, in my supplemental exhibits, the government conceded they had no evidence that she knew of the thefts. Didn't she accompany him on all of these luxurious travel that he engaged in? I mean, she certainly benefited from wherever the money was coming from. And the government made a pretty compelling showing in the four-day sentencing hearing that he had an awful lot of unexplained cash revenues that could not be attributed to the rental property in Philadelphia or his income as a special agent for Homeland Security. Well, I think the facts show, and you give this to our expert, that Mr. Doren was making a significant amount of money from the Philadelphia rental properties. But not enough to account for cash deposits. Most of those, as I understand it, were basically paid by check or, I guess, electronic transfer if they were government subsidized Section 8 housing payments. In fact, your honor, all of those payments that Mr. Doren received, virtually all of them were cash. These are folks who don't have bank accounts. They cashed tax and they virtually all the money. But didn't the revenue agent schedule something like $1.3 million or upwards of $2 million in cash deposits over the period of time that they looked at? Yes, your honor. We noted Mr. Doren made, I believe it was close to $400,000 in 2013 and took in rents of over $600,000 in 2014, which more than accounted for the cash. But the district court found that there were no corresponding cash withdrawals commensurate with the quantities that we're talking about when Mr. Doren, is it Duren or Duran? Duren. When Mr. Duren moved money from the east coast to the west coast. That's because most of the cash he collected was never deposited in the bank. It was brought back by him in cash. I thought there was an assessment of cash deposits. That was the exhibit that I had of that. There were cash deposits in the California account for a time period. There was the cash going in to banks in Philadelphia due to the fact that he had a dispute with his partner. But after that dispute was settled, that money just was not deposited in the bank in Philadelphia. It was sent, brought back by him to San Diego. But Mr. Kirby, I think what concerned me was that the district court basically looked at all of that evidence and said the numbers here just aren't adding up. There's more cash here than Mr. Duren or his forensic accountant can explain. And then that leads to my related question about clearly the Duren's were living large and spending a lot of money. And the district court relied on that in part to show that Mrs. Duren obviously was knowledgeable about the fact that her husband was spending large amounts of money that the district court found could not be traced back to legitimate sources. So why can't the district court consider all of that in determining that she was a participant in his endeavors, had knowledge of and made bank deposits and other bank records supporting her role in the offense as well? Well, again, Your Honor, there was no evidence that she had any knowledge and the government itself conceded that in an email to me that there was no evidence that she knew of in place. And there's no other evidence that she made one single deposit during the relevant time period, one. She was on a bank account because she was Mr. Duren's wife. I thought she accompanied him on the trip to, was it Croatia, where the bank account was established? The second trip, the bank account was established in 2014. He traveled there in 2016, I want to say, but he was looking to make actual investments in Croatia at that time period. It wasn't unusual for her to be added to the account. I mean, if something happened to him, she would want to be able to get, you know, those funds. But there's no other evidence that she was aware as the government conceded that she was aware that he was ripping off drug traffickers. But by that time, the federal agents had already searched their homes, right, before they went to Croatia? Sure. Yes, they did. It could be an inference that they knew that they were being investigated and they were placing monies offshore, or at least that's what the district court considered that. Well, the money was actually placed offshore before the investigation. It was only after the bank had been established that she went there just to look at the properties and become a signatory. I see my time's up. Thank you. Ms. Marsh? You're on mute. Sorry, I even wrote myself a note to unmute. I apologize. May it please the court, I'm Abby Brunton Marsh, appearing on behalf of the United States. And I can talk about an overview, or I can just start with Roel, where we were. Why don't you address the issue that Mr. Kirby and I were talking about? Yes, I'll start there. Certainly, Your Honor. So, Your Honor is right that both of Your Honors are correct, that this Croatian account was opened after the search warrant, the initial search warrant in September of 2014. And it's true that Mrs. Duren did not travel with the defendant the first time he went to Croatia to open the account. She did come later in 2016. But that is significant, and it does lead to the inference that Judge Lee mentioned, that she knew at that point that he was being investigated. And when you sort of zoom out and look at her whole role as a spouse in this marriage and in this business, particularly the properties in Philadelphia, there's evidence in the record that she was working since 2000, starting in 2008. She didn't work outside the home. She worked as a bookkeeper for GHP Properties, one of the in Philadelphia, which is important and came in in the testimony as well, about how they were collecting rents and scheduling or documenting those rents. But Mrs. Duren had a unique knowledge and understanding of their financial situation, not only because of the other property transactions that had happened in California, including the mortgage fraud count that she pled guilty to, but also because she assisted with, and in fact testified in a deposition in their civil lawsuit, that she was the owner of some of those properties in Philadelphia under the U.S. Holdings, a different entity. So she's not a sort of innocent spouse who wouldn't know what was going on in their finances. She had a really heightened level of understanding of their on all of their accounts, their business accounts and their personal accounts. And based on the testimony from both the revenue agent and the case agent, large amounts of money were moving in and out of all of those accounts. But to the defendant's benefit, the court discounted and did not count, and even in the government's calculation to the that were deposited in Philadelphia. None of those cash deposits or check deposits that were made in Philadelphia that were clearly associated with the rental properties were counted against the defendant, either for the loss amount or in considering that for his wife's role as a participant. Ms. Marsh, Ms. Marsh, excuse me, this is Judge Schroeder. I wanted to ask you which of the calculations that are challenged here had the greatest impact on the sentence? Is it the total amount of the total loss calculation or which one? Which changed that? Yeah, which he challenged. The appellate challenges a number of the district court's findings and calculations. I'm asking you which one had the greatest impact on his sentence so that you can address that and he can respond in rebuttal. Yes, the greatest increase in the sentence was actually the plus six for the knowledge that these are proceeds of money laundering under the defendant is challenging the application of guideline 2S1.1B1, which says that he knew or believed any of these funds were the proceeds of sale or distribution of controlled substances, just drug trafficking for short. In that count or in that increase, it is a sixth level increase, but it's clearly supported by the evidence. In the defendant's change of plea colloquy, I went back through the record and tabbed how many times he admitted that he knew these were drug proceeds. I came up at least 14 times. The court directly asked him, did you know the money you deposited were the proceeds of drug trafficking? And not only based on his admissions of the change of plea, but just his job. He was an HSI agent specializing in the interdiction of bulk cash being smuggled for drug payment back to Mexico. He in fact, and this was in the record as well, he worked as a training agent and there was some evidence presented about the PowerPoint and the trainings he presented about structuring, which were some of the dismissed counts here and about money laundering. So he really had a unique knowledge about drug trafficking. Well, one of his arguments is that it should not have been treated as proceeds of drug trafficking that should have been treated as theft of government property. So what is your response to that? Yes, your honor. I think that my response is twofold. First, the counts that he pled to, the violations of 1957, require as an element that these were in fact the proceeds of drug trafficking the way that this indictment is charged. So he pled to it. In addition to that, that's sort of a charging question versus a guideline application question, right? He was charged with proceeds of drug trafficking. He pled to that. Additionally, I think defendant's argument, while novel and really interesting here, really sort of conflates possessory interest and the character of money. So does the theft of money change it from drug proceeds to stolen property? And I would I looked hard and maybe the court can find one that I couldn't find. But it's really conflating the two. And the character of the money does not change. And I think we need to circle back where the court, the district court properly looked back at the plain language of the guideline. He pled to the count that included proceeds of drug trafficking and the guideline itself. While I understand you have to get to the A2 subsection before you get to the B1 subsection, the B1 subsection itself is very clear that knowledge is the requirement. And he had that knowledge. So had he been charged and pled guilty to a 641 theft of government property charge, he'd have a much stronger argument than the 1957 charge that he pled guilty to.  Thank you. And if the court would like me to address the loss amount calculation, I think we sort of addressed that somewhat in considering the role. Sorry, excuse me. Before we go to that, I just want to clarify one thing. For the two-level enhancement, if you just assume that the, you know, we don't agree with you at the district court about the mortgage fraud scheme, that it's too far in time and subject matter related to, you know, the core facts of this case, would the two-level enhancement still apply, assuming, you know, we consider other things like the Croatian bank and the knowledge? So even if we take out the mortgage fraud factual basis, would the two-level enhancement still apply? Yes, it does, Your Honor. And I think the facts that support it still are keeping in mind that we're really able to draw an inference based on the facts that I'll tick through in a moment, and that this is a preponderance standard, and that we're looking to see if the judge's application was clear air, right? Was it illogical or implausible or without support? But there are plenty of facts to support her knowledge. And I don't believe the law requires that she has to have known it was proceeds of a drug rip. I think the law requires that we have to be able to show a reasonable inference that she was a participant. And here, it's some of the issues I mentioned already, that she knew about his job, she knew about his regular income, and she had unique knowledge about the proceeds that they were earning or not earning. There was actually a lot of testimony about how the Philadelphia properties were operating at a loss at some point during the time she was a bookkeeper. Their expenditures on legal services, she knew that they were in a lawsuit. They spent $50,000 in cash to pay for their attorney in that lawsuit, and that was also during this time period. The $70,000 down payment on a new house, that happened in October of 2013, in the middle of this timeframe. And the deposit that the defense counsel conceded she made, that $16,000 deposit, was May of 2014. So it's really fairly close in time that they've just moved into this large house, they're traveling, they're remodeling, paying cash for that. There's ample evidence that you could draw the inference that she knew that these funds that she was depositing at his direction were the proceeds of ill-gotten gains. I'm running out of time. Does the court have any questions? Yes, your honor. I'd like to take this little time to talk about the sixth level enhancement. The crime that Mr. Duran initially created, the underlying crime, the theft that was recognized by the government in their pleadings, recognized by the court, and recognized by probation. The fact that he stole from a drug trafficker is not where the guideline analysis should start. In fact, this would be like, and I use this in my, I think my reply brief, it would be as though someone stole a piece of artwork that had been seized by the Nazis during World War II. If someone stole that artwork, you would prosecute them for theft, you would not prosecute. Counsel, the problem with your theory is that if he took, you classified as theft, money from a drug courier, the drug courier doesn't have title to that cash. It is certainly incriminating evidence that other investigations showed linked it to the proceeds of drug sales. But I guess the question here is, can you be guilty of theft of property that doesn't belong to the victim? Well, your honor, I did cite those three cases involving the Los Angeles Sheriff's Department, where in fact they stole money that had been taken from a drug trafficker. And basically, the analysis the Ninth Circuit went through was that the money, once it was seized, became property of the sheriffs. And at that point, it was theft of government property. The relation back theory that I think you're arguing under the forfeiture statute would vest title in the government at the moment that the drug deal occurs and the drug seller obtains money from the buyer, and it's the proceeds of illegal activity. So if anybody had title to the money, it would have been the initial drug seller, not the courier. I'm not sure your theft argument holds water. Your honor, regardless of when, under the statute, it becomes government property the moment the transaction occurs. But the transaction is not taking it from the money courier. It's the proceeds of the illegal sale from which title reverts back to the government. Because no one can hold title to contraband. And that becomes contraband at that point, like it was drugs. It becomes under the statute, if I may respond, it becomes under the statute government property at the time of the transaction. And even before he took it, it was already government property. It's an interesting argument. I have to give you credit for a clever argument, but I just, I just am not buying it. I guess I'll have to give it some more thought, but it just doesn't make any sense to me. I'm out of time. Okay. Yes. Thank you. Thank you both for the helpful argument that this case has been submitted. Thank you. Thank you both.
judges: SCHROEDER, TALLMAN, LEE